

# In the Missouri Court of Appeals
## Eastern District

### DIVISION THREE

| | | |
|---|---|---|
| THOMAS R. WILSON, APPOINTED TRUSTEE OF CHAPTER 7 ESTATE OF JAMES E. JOHNSON, | ) ) ) ) | No. ED103619 |
| Appellant, | ) ) | Appeal from the Circuit Court of St. Louis County |
| vs. | ) ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) ) | Hon. Barbara W. Wallace |
| Respondent. | ) | Filed: February 7, 2017 |

### OPINION

Thomas R. Wilson, Appointed Trustee of the Chapter 7 Estate of James E. Johnson ("Johnson"), appeals from the judgment of the circuit court following partial summary judgment and a subsequent jury verdict rejecting his negligence claims brought against Union Pacific Railroad Co. ("Union Pacific") under the Federal Employer's Liability Act, the Locomotive Inspection Act, and the Safety Appliance Act. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

We review the evidence presented at trial in the light most favorable to the jury's verdict, as required by our standard of review.[1] Johnson was a railroad worker with Union Pacific for

---

[1] In Point I, Johnson appeals the court's judgment granting summary judgment, requiring this Court to review the record in the light most favorable to Johnson, the non-moving party. To avoid confusion, we review facts related to summary judgment separately and according to the proper standard of review in the analysis section of Point I.

forty-six years, from the time he graduated high school in 1962 until his retirement in 2008. Johnson initially worked as a railroad fireman, eventually worked his way up to brakeman, and finally was promoted to conductor.

In 2007, one year before his retirement, Johnson was working as a brakeman on a Union Pacific train with James Bradshaw ("conductor") and Bradley Hurst ("engineer"). They were taking a train through Louisiana from Alexandria to Livonia. When the train entered the Livonia Yard, it had several railcars and two locomotive engines ("Johnson's Engine").[2]

The crew entered the Livonia yard on the receiving tracks and left their railcars at the north end of the yard. The yardmaster then instructed Johnson's crew to put their two engines onto one of the four Diesel Service Tracks at the south end of the yard. These tracks diverge from the main receiving tracks and lead towards a building known as "the shed" or diesel shop, where locomotive engines are repaired. This is a service area under "blue flag protection"[3] and secured by derails,[4] which are locked except when an engine is authorized to enter the area. In this area, the locomotive foreman controls all activity, and train crews, like Johnson's, must get authorization from the locomotive foreman prior to entering the area or interacting with any of the other engines located there.

When Johnson's Engine entered the Diesel Service Track, two other locomotives were already on the track between Johnson's Engine and the diesel shop, the UP 9484 and the UPY 106. Both of these locomotives were stationary, parked near the shed about fifty feet apart, unattended, with their lights and engines turned off. As Johnson's Engine moved towards the

---

[2] For the purpose of this opinion, the terms "locomotive," "engine," "locomotive engine," "diesel," and "diesel engine" have the same meaning. The terms are used interchangeably in this opinion because they appear without differentiation in the record, as well as in the parties' briefs, and the statutes, regulations, and cases they cite.

[3] In the railroad industry, blue flags are a universal sign meaning equipment is being serviced or inspected and should not be used except by authorized personnel.

[4] A derail is a removable device placed on train tracks that prevents a train from passing by blocking the tracks.

diesel shop, engineer Hurst and conductor Bradshaw were together in the front cab, while Johnson was on the rear. The engineer's job was to operate the engine's controls, while Johnson's job as the brakeman was to be the engineer's eyes, watching the track and relaying instructions to the engineer by radio.

Johnson saw the UP 9484, and started relaying the distance to the engineer in railcar lengths. . . five cars, two cars, one-half car. Johnson testified he called for the engineer to stop. However, the engineer testified he never heard Johnson say "stop" until after Johnson's Engine made contact with the UP 9484. When the engines made contact, they did not couple[5] upon impact, and the UP 9484 began rolling towards the diesel shop. Johnson testified the failure to couple was probably due to misalignment of the couplers. Johnson jumped down, and ran towards the UP 9484 to set the handbrake. In the process, Johnson fell and asserts he injured his neck and back.

At trial, Union Pacific introduced evidence of three rules governing procedures for coupling with other engines. First, under Rule 5.13F of Union Pacific's General Code of Operating Rules ("Operating Rules"), Johnson was prohibited from coupling his engine to any other engine in an engine service area, such as the Diesel Service Track, without first being instructed to do so by the locomotive foreman. Johnson admitted he never received this authorization. Second, under Livonia's "50 foot rule," Johnson was required to stop fifty feet away from another engine prior to coupling. The evidence indicated Johnson's Engine did not stop fifty feet away from the UP 9484 prior to attempting to couple. Third, under Operating Rule 7.4, Johnson was required to verify that an engine is properly secured and can be coupled and

---

[5] "Coupling" is the process of pushing two engines or railcars together so the attachment knuckles, or "couplers," on each connect and attach. In order to properly couple, the couplers must be aligned.

moved safely prior to coupling. Johnson admitted he failed to follow this rule because he never set the handbrake on the UP 9484 or checked the alignment of the couplers prior to attempting to couple.

Upon returning to Alexandria, Johnson reported the accident and his injury to his supervisor and filled out an injury report. Johnson was initially treated two months later by Dr. Gordon Webb, who ordered tests and released him back to work. Johnson never missed a day of work from the day of the accident in 2007 until his retirement a year later in 2008. Johnson retired when eligible based on his age and years of service. Johnson never mentioned anything about retiring due to any injury or disability.

Johnson received no medical treatment for his neck or back for a period of nearly two years following his initial treatment from Dr. Webb. Then, in January of 2010, Johnson sought treatment from Dr. George Schoedinger, a surgeon in St. Louis, who performed neck surgery and continued treating him until 2012.

In May of 2010, Johnson filed a petition against Union Pacific, alleging negligence under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* (2007), the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701 *et seq.* (2007), and the Safety Appliance Act ("SAA"), 49 U.S.C. § 20302 *et seq*. (2007). Count I alleged negligence under FELA, claiming Union Pacific's negligence caused the accident and Johnson's injuries by failing to provide a safe workplace, equipment, and procedures. Counts II and III alleged negligence *per se*, claiming Union Pacific violated the LIA and the SSA because the UP 9484 was defective in that it did not "automatically couple" upon impact. Counts IV, V, and VI alleged negligence, claiming Union Pacific failed to provide safe working conditions over the course of Johnson's career.

4

Prior to trial, Union Pacific filed a motion for partial summary judgment on Counts II and III, arguing that neither the LIA nor the SAA applied to this accident because the UP 9484 was not "in use" at the time of the accident, that there was no evidence of a violation of either act because the failure to couple due to misalignment is not a statutory violation, and that these claims were barred by the statute of limitations. The circuit court granted this motion, finding that the UP 9484 was not "in use." Johnson then voluntarily dismissed Counts IV, V, and VI.

A jury trial was held on the remaining count, alleging negligence under FELA. Union Pacific denied Johnson's allegations of negligence. Specifically, regarding causation, Union Pacific argued Johnson was the "sole cause" of his own injuries because he violated multiple rules that would have prevented the accident. Concerning damages, Union Pacific argued Johnson did not suffer any compensable injury because he did not receive any medical treatment for his alleged injuries for a period of nearly two years prior to filing suit, and he never missed a day of work until his retirement, which was due to age and years of service, rather than any injury or disability. At the close of all the evidence, Johnson filed a motion for a directed verdict, which the court denied. The court allowed Johnson to submit two claims to the jury, FELA negligence and negligence *per se*.

The jury returned a verdict in favor of Union Pacific. On the FELA negligence claim, the jury found Union Pacific zero percent at fault, instead attributing one hundred percent of the fault to Johnson. On the negligence *per se* claim, the jury found in favor of Union Pacific. The jury also determined Johnson suffered zero dollars in damages. The court entered judgment in favor of Union Pacific on both claims. Johnson then filed a motion for judgment notwithstanding the verdict, which the court denied. This appeal follows.

**POINTS ON APPEAL**

Johnson raises four points on appeal. In Point I, Johnson argues the circuit court erred in granting summary judgment on the LIA strict liability claim. In Point II, Johnson argues the circuit court erred in admitting evidence that railroaders like him are eligible or receive retirement benefits at age sixty with thirty years of service because such evidence was highly prejudicial, and its admission violated the collateral source rule as applied in FELA cases. In Point III, Johnson argues the circuit court erred by denying his motions for a directed verdict and judgment notwithstanding the verdict on the issue of negligence *per se* based on Union Pacific's statutory violations for not having a handbrake set on the unattended locomotive UP 9484. In Point IV, Johnson argues the jury's verdict was against the weight of the evidence.

**DISCUSSION**

**I.     Point One – Partial Summary Judgment on Johnson's LIA Claim Was Proper**

In his first point on appeal, Johnson argues the circuit court erred in granting Union Pacific's motion for summary judgment on Johnson's LIA claim. We disagree.

A.     Standard of Review

Our standard of review for a trial court's decision granting a motion for summary judgment is *de novo*. *Daugherty v. City of Md. Heights*, 231 S.W.3d 814, 818 (Mo. banc 2007). Summary judgment is appropriate where the moving party has demonstrated there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law. *Id*.; Rule 74.04(c)(6). A fact is "material" if "it has legal probative force as to a controlling issue in the litigation." *Y.G. v. Jewish Hosp. of St. Louis*, 795 S.W.2d 488, 494-95 (Mo. App. E.D. 1990). An issue as to a material fact is "genuine" when "the record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' is real, not merely argumentative,

6

imaginary, or frivolous." *Daugherty*, 231 S.W.3d at 818. This court reviews the record on the motion for summary judgment in the light most favorable to the party against whom judgment was entered. *Id*.

To prevail on a motion for summary judgment, a defending party may establish a right to summary judgment by demonstrating: (1) facts negating any one of the elements of plaintiff's claim; (2) that after an adequate period for discovery, plaintiff has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one of the elements of plaintiff's claim; or (3) that there is no genuine dispute as to the existence of the facts necessary to support movant's properly pleaded affirmative defense. *Stanbrough v. Vitek Sols., Inc.*, 445 S.W.3d 90, 96-97 (Mo. App. E.D. 2014) (citing Rule 74.04(c)).

Once the moving party has met this burden, the burden shifts to the non-moving party to come forward with new evidence or to identify evidence already in the record that directly challenges or contradicts these facts. *Nangle v. Brockman*, 487 S.W.3d 29, 34 (Mo. App. E.D. 2016). The non-moving party cannot meet its burden to oppose a motion for summary judgment by merely relying on the allegations in the pleadings or denials of the facts alleged, but must produce affirmative evidence demonstrating that a material fact is genuinely disputed. *Id*.

B.      Analysis

In Point I, the issue is whether the UP 9484 was "in use" under the LIA at the time Johnson's Engine made contact with it. This is a question of law to be determined by the trial court. *Host v. BNSF Ry. Co.*, 460 S.W.3d 87, 101 (Mo. App. W.D. 2015). If the UP 9484 was "in use," then the LIA applies and Union Pacific is strictly liable for injuries resulting from any defect on the engine. If the UP 9484 was not "in use," Johnson's claims asserting strict liability

for the UP 9484's failure to automatically couple upon impact must fail as a matter of law, and summary judgment was proper.

Under the LIA, federal law regulates when "[a] railroad carrier may use or allow to be used a locomotive or tender on its railroad line." 49 U.S.C. § 20701. If the LIA applies, then a railroad will be held strictly liable for injuries caused by defective locomotives, and may not rely on the defenses of contributory negligence or assumption of risk. *Host*, 460 S.W.3d at 101-02; *Wright v. Ark. & Mo. R.R. Co.*, 574 F.3d 612, 620 (8th Cir. 2009). The LIA only applies when a locomotive is "in use." *Host*, 460 S.W.3d at 101. The purpose of this limitation is "to encourage and allow railroads to remedy hazardous conditions by relieving them of the strict liability imposed by the LIA when a locomotive is being inspected, repaired, or serviced." *Id*. at 101-02.

In the federal courts, there is a split of authority among the circuits regarding when a locomotive is "in use" under the LIA. *Id*. at 102; *Wright*, 574 F.3d at 620-21 (citing *Trinidad v. S. Pac. Transp. Co.*, 949 F.2d 187, 189 (5th Cir. 1991)). The Fifth Circuit established a bright-line test dependent upon a single factor, whether the locomotive at issue has completed its inspection and is released for use. *Trinidad*, 949 F.2d at 189. The Fourth and Eighth Circuits have adopted a multi-factor test that examines the totality of the circumstances and identifies two primary factors for consideration: "[1] where the train was located at the time of the accident, and [2] the activity of the injured party." *Wright*, 574 F.3d at 620-21 (adopting the Fourth Circuit's rule announced in *Deans v. CSX Transp., Inc.*, 152 F.3d 326, 329 (4th Cir. 1998)).

In the Missouri Court of Appeals, there is no such split of authority. The only case addressing this issue is *Host v. BNSF Railway Co.*, where the Western District held:

> The weight of authority has rejected bright-line tests for determining whether a locomotive is "in use" in favor of a more flexible test that explores a number of factors and looks primarily at "where the train was located at the time of the accident and the activity of the injured party."

8

*Host*, 460 S.W.3d at 102 (adopting the rule from the Eighth Circuit). We have found no Missouri case applying a bright-line rule similar to the Fifth Circuit, nor has Johnson cited any authority.

Although this Court is not bound by precedent from the Eighth Circuit, we may consider it as persuasive authority, particularly where the law at issue is a federal statute that provides concurrent jurisdiction in both state and federal courts. *Id*. Moreover, as recognized by the court in *Host*, this Court should seek "consistency in the legal standards to be applied by our state courts and the Eighth Circuit if at all possible." *Id*. We therefore adopt the rule announced by the Eighth Circuit in *Wright* and adopted by the Western District in *Host*. *Wright*, 574 F.3d at 620-21; *Host*, 460 S.W.3d at 102.

Reviewing the evidence presented in the light most favorable to Johnson, the non-moving party, the following facts were undisputed in the motion for summary judgment. Immediately prior to the accident, Johnson and his crew entered one of the Diesel Service Tracks at the Livonia Yard. These service tracks diverge from the main receiving tracks and lead towards the diesel shop. This is a service area under "blue flag protection" and secured by derails, which are locked except for when an engine is authorized to enter the area. The UP 9484 was in the service area for inspection the day before the accident, and had not yet been released for service. When Johnson's Engine made contact with the UP 9484, it was sitting immobile and unattended in a service area with its engine and lights turned off. Johnson was never instructed to couple with the UP 9484 by the locomotive foreman, the only individual authorized to give such an instruction. According to three applicable work rules, prior to coupling with another engine in this service area, Johnson was required to obtain authorization from the locomotive foreman, stop his engine fifty feet away, get out, and visually inspect the UP 9484 to ensure the couplers were aligned and

9

the handbrake was set. Johnson failed to follow any of these rules prior to attempting to couple his engine with the UP 9484.

These facts were established by Union Pacific in its statement of uncontroverted facts, and were supported by the deposition testimony of Johnson himself as well as the affidavit and subsequent deposition testimony of John Valley ("Mr. Valley"), the trainmaster at the Livonia Yard and Union Pacific's representative. Johnson argues that "[t]he only facts which are uncontroverted in the record before the trial court are those which are admitted by Appellant, and not those which are denied or to which there is an objection." While Johnson did specifically deny some of these facts in his response to the motion for summary judgment, he did not actually submit any evidence bringing these facts into dispute or otherwise contradicting Union Pacific's evidence.[6] *See* Rule 74.04(c)(2).

Once the moving party has carried its burden on the motion for summary judgment, the non-moving party bears the burden of identifying evidence in the record or coming forward with new evidence that brings one of the material facts into dispute by directly challenging or contradicting the moving party's evidence. *Nangle*, 487 S.W.3d at 34; *see also* Rule 74.04(c)(2) ("A denial may not rest upon the mere allegations or denials of the party's pleading. Rather, the response shall support each denial with specific references to the discovery, exhibits or affidavits that demonstrate specific facts showing that there is a genuine issue for trial."). Johnson failed to meet his burden by merely denying the facts supported by Mr. Valley's affidavit and testimony without identifying or producing any evidence directly challenging the testimony. Therefore, we conclude that any facts affirmatively established by Mr. Valley's affidavit or deposition

---

[6] Johnson's only effort to contradict this evidence was to demand a deposition of Mr. Valley, which the circuit court granted prior to ruling on the motion. In our review of the record, it is clear that Mr. Valley's deposition reinforced and further supported the existence of Union Pacific's facts, and there was no contrary evidence in the record.

testimony, but not contradicted by other evidence in the record, were therefore uncontested at the time of the motion for summary judgment. *Nangle*, 487 S.W.3d at 34 (accepting facts presented in movant's statement of uncontroverted facts where non-movant failed to identify or produce any specific evidence contradicting these facts).

Based upon these facts and the totality of these circumstances, we find the UP 9484 was not "in use" at the time of the accident. Considering the first factor under *Wright*, the location of the train, we note the UP 9484 was located on the Diesel Service Track when Johnson's Engine made contact with it. All the evidence established this was a service area under blue flag protection. This fact was supported by the affidavit and subsequent deposition testimony of Mr. Valley. In addition, Johnson admitted he was told "to put [the engines] in the engine service track." Moreover, the UP 9484 was not simply located in a service area, it was sitting dead on the track, where it had been since its inspection the day before and had not yet been released for service. These facts alone strongly weigh in favor of finding the UP 9484 was not "in use" at the time of the accident under the first factor in *Wright*. *See Wright*, 574 F.3d at 619-22 (holding locomotive was not "in use" when it was parked on a repair track for inspection, was in a blue flag area, and had not yet been released for use following the inspection).

Considering the second factor under *Wright*, the activity of the injured party, Johnson was entering a service area and attempting to couple with the UP 9484 at the time of the incident. Johnson acknowledged in his deposition that he intended to couple his engine to the UP 9484. He stated he was instructed by the yardmaster to put his engine "all the way back" up to the diesel shop, which he understood as meaning he should couple with the UP 9484. However, Johnson also admitted he was never authorized to couple his engine with the UP 9484 by the locomotive foreman, the only person who could give authorization since the UP 9484 was in a

11

service area. Moreover, three work rules prohibited Johnson from coupling with the UP 9484 under these circumstances, and it was undisputed that Johnson violated these rules by failing to set the handbrake on the UP 9484 or check the alignment of the couplers. Thus, under the second factor in *Wright*, we find the activity of Johnson in attempting to couple with an engine sitting dead on the tracks in a service area, in violation of work rules, and without proper authorization weighs strongly in favor of finding the UP 9484 was not "in use" at the time of the accident.

However, Johnson argues the UP 9484 was nevertheless "in use" for three reasons. First, the UP 9484 did not have blue flags placed on it, which Johnson argues should be dispositive, applying the Fifth Circuit's bright-line test from *Trinidad*, 949 F.2d at 189, yet relying on a different dispositive factor borrowed from *Wright*, 574 F.3d at 622. Second, Johnson argues the UP 9484 was not located within the diesel shop and was therefore still on its "unitary journey to the point of repair," citing *Brady v. Terminal R.R. Ass'n of St. Louis*, 303 U.S. 10 (1938), and misquoting *S. Ry. Co. v. Bryan*, 375 F.2d 155 (5th Cir. 1967) (holding a defective railroad vehicle is "in use" under the SAA where "hauling . . . is in progress or in immediate contemplation [because] the handling of it for that purpose is a part of its unitary journey from the point of discovery of disability to the repair shop"). Third, Johnson argues his conduct necessarily put the UP 9484 "in use" because it was necessary for him to couple with the UP 9484 in order to follow his instructions to put his engines all the way back to the diesel shop, which "is the de facto meaning of a locomotive being in use," a proposition for which he cites no legal authority. We find these arguments unpersuasive.

First, the absence of blue flags placed on the UP 9484 is not dispositive. The courts in *Wright* and *Host* made it clear that in Missouri, the test for whether a locomotive is "in use" under the LIA depends on the totality of the circumstances, rather than a single dispositive

12

factor, such as the presence or absence of blue flags. *Wright*, 574 F.3d at 620-21; *Host*, 460 S.W.3d at 102. Even if we accepted Johnson's argument, Mr. Valley testified the Diesel Service Track is a service area under blue flag protection, testimony that was undisputed in the motion for summary judgment. Moreover, even if this court applied the Fifth Circuit's bright-line test, the single, dispositive factor in *Trinidad* was whether the engine at issue had been "released following inspection." *Trinidad*, 949 F.2d at 189. In this case, the UP 9484 had not been released for use and was still located in the service area, sitting unattended on the Diesel Service Track with the engine and lights off. Therefore, Johnson's argument fails even under the more stringent bright-line test applied by the Fifth Circuit.

Second, the UP 9484 was no longer on its "unitary journey from the point of discovery of disability to the repair shop." Johnson's reliance on *Bryan* and *Brady* is misplaced. *Bryan*, 375 F.2d at 157. *Bryan* is clearly distinguishable in that the railcars at issue in that case were involved in a collision, which caused them to derail and rendered them completely inoperable. At the time of plaintiff's injury, he was attempting to get these railcars back on the tracks and transport them to a service area for repairs. The Fifth Circuit held these inoperable railcars were "in use" under the SAA because, "[w]here the hauling of a disabled or defective railroad vehicle is in progress or in immediate contemplation, the handling of it for that purpose is a part of its unitary journey from the point of discovery of disability to the repair shop." *Id.* at 157. Additionally, *Brady* is distinguishable in that the engine in that case was located on a *receiving* track and was stopped momentarily for the sole purpose of determining whether it would be accepted into the yard. *Brady*, 303 U.S. at 11. The Supreme Court held the engine was still "in use" because an "inspection for the purpose of discovering defects" does not mean it is no longer "in use" under the LIA. *Id.* at 16.

13

Here, the UP 9484 was already located in a service area at the time of the accident. Unlike the railcars in *Bryan*, the UP 9484 was not being transported from the location of a crash to a service area for repair. Unlike the engine in *Brady*, the UP 9484 was not located on a receiving track stopped temporarily for the sole purpose of determining whether it would be accepted into the yard. The UP 9484 ceased to be "in use," and its "unitary journey" ended the day before when it reached its place of repair, the service area of the Livonia Yard just outside the diesel shop.

Finally, Johnson's decision to couple with the UP 9484 because it was in his way did not render the UP 9484 "in use" under the LIA. Here, it is undisputed that Johnson did not have proper authorization to couple with the UP 9484, whether or not it was in his way. Also, as discussed above, three work rules prohibited Johnson from attempting to couple with the UP 9484 under the circumstances of this case. Johnson's decision to couple with the UP 9484 without authorization and in violation of Union Pacific's rules does not alter our conclusion that the UP 9484 was not "in use" under the LIA.

The purpose of the "in use" limitation to the LIA is to encourage and allow railroad companies to take defective locomotives out of service for inspection and repairs by relieving them of strict liability for defects in those engines while they are being serviced. *Host*, 460 S.W.3d at 101-02. This is precisely what Union Pacific did when it took the UP 9484 out-of-service by placing it on the Diesel Service Track for inspection. If we allow Johnson's unauthorized coupling with this engine to bring an otherwise out-of-service engine into use and impose strict liability on the railroad, this would defeat the clear purpose of the LIA.

14

For the foregoing reasons, we find the circuit court did not err in granting summary judgment against Johnson on his LIA claims because, as a matter of law, the UP 9484 was not "in use" at the time of the accident. Point I is denied.

## II.    Point Two – Evidence of Plaintiff's Retirement Was Properly Admitted at Trial

In his second point on appeal, Johnson argues the circuit court erred in allowing the admission of evidence that railroaders like him "are eligible or receive retirement benefits at age 60 with thirty years of service," in violation of the collateral source rule as interpreted and applied in FELA cases. We disagree.

### A.    Standard of Review

A trial court's decision to admit or exclude evidence is reviewed only for an abuse of discretion. *Frazier v. City of Kan. City*, 467 S.W.3d 327, 338 (Mo. App. W.D. 2015). The trial court is entitled to "substantial deference" regarding the admissibility of evidence. *Ford v. Gordon*, 990 S.W.2d 83, 85 (Mo. App. W.D. 1999); *see also Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991). An abuse of discretion exists when the trial court's ruling "is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Secrist v. Treadstone, LLC*, 356 S.W.3d 276, 280 (Mo. App. W.D. 2011).

### B.    Analysis

To be admissible, evidence must be both logically and legally relevant. *Frazier*, 467 S.W.3d at 338. Evidence is logically relevant if it tends to make the existence of a material fact more or less probable than it would be without that evidence. *Id*. Evidence is legally relevant if its probative value outweighs the risk of unfair prejudice, confusing of the issues, misleading the jury, undue delay, waste of time, or cumulativeness. *Id*.

15

As a general rule in FELA cases, evidence that the plaintiff received payments from a "collateral source" is inadmissible for the purpose of impeaching the plaintiff's testimony as to his motive for not returning to work and the permanency of injuries. *Moore v. Mo. P.R. Co.*, 825 S.W.2d 839, 842 (Mo. 1992) (citing *Eichel v. New York Central R.R. Co.*, 375 U.S. 253, 254 (1963) (per curium)). Disability or retirement benefits may be considered evidence of collateral source payments. *Moore*, 825 S.W.2d at 842; *Melton v. Ill. C. G. R. Co.*, 763 S.W.2d 321, 326 (Mo. App. E.D. 1988). However, an exception to this rule allows the introduction of evidence of collateral source payments when the plaintiff voluntarily injects the issue into the case by introducing evidence of his own financial condition. *Moore*, 825 S.W.2d at 842 (citing *Lange v. Mo. Pacific R.R. Co.*, 703 F.2d 322 (8th Cir. 1983)).

We find the trial court properly excluded any evidence of collateral source payments for Johnson's injury. Prior to trial, the court granted Johnson's motion *in limine* barring the introduction of evidence that Johnson was receiving retirement *benefits* unless Johnson opened the door to the issue by introducing evidence of his own financial condition. During trial, Johnson never opened this door, and the court never admitted any evidence concerning Johnson's retirement *benefits* or the amount of this compensation. Although retirement *benefits* were mentioned at trial, it was in reference to the retirement of a different railroad employee, not Johnson. Even then, the court excluded this evidence once objected to by Johnson. Johnson fails to identify any specific ruling by the trial court which erroneously admitted evidence concerning his retirement benefits.

While Johnson accurately states that Union Pacific references the timing of Johnson's retirement as part of its defense, we note Johnson first introduced evidence about his retirement during his case-in-chief. Johnson made his retirement an issue in the case by testifying he retired

16

because he was afraid continuing to work might be dangerous due to his prior injury and "[i]t wasn't cause I wanted to." Johnson also introduced into evidence a letter to Union Pacific announcing his retirement. As a preliminary matter, we note the evidence Johnson now argues was erroneously admitted was in fact first introduced into evidence by Johnson himself. *See Stegner v. Mo.-Kan.-Tex. R.R. Co.*, 64 S.W.2d 691, 694 (Mo. 1933) (under the invited error doctrine, "a party may not invite and join in the commission of error and thereafter be heard to complain of it"); *James v. Kan. City Gas Co.*, 30 S.W.2d 118, 125 (Mo. 1930) (holding invited error doctrine bars appellant from appealing the admission of evidence where appellant invited the error by being the first to introduce the evidence, thus injecting the issue into the case); *State v. McFall*, 737 S.W.2d 748, 756 (Mo. App. S.D. 1987) (applying invited error in a criminal case, stating: "The invited error doctrine is that a party who has introduced evidence pertaining to a particular issue may not object when the opposite party introduces related evidence intended to rebut or explain.").

Even if the admission of evidence concerning Johnson's retirement was not invited error, we find this evidence was both logically and legally relevant because the timing and motivation for his retirement was directly at issue in this case. Johnson injected these issues into the case when he testified that he retired due to an injury caused by the accident. The fact that Johnson retired fourteen months after his alleged injury without missing a day of work undermined his testimony that he was injured due to the accident involving the UP 9484. Similarly, the fact that Johnson retired when eligible based on his age and years of service undermined his testimony that he retired due to an injury, making it less likely that he actually suffered any injury due to the accident. Although there are some circumstances where the facts surrounding a plaintiff's retirement could be unfairly prejudicial, such as introducing evidence of a plaintiff's retirement

17

benefits to argue the plaintiff was malingering and had a financial motivation not to return to work, this is not one of those cases. *See Moore*, 825 S.W.2d at 842. Here, the judge eliminated any risk of prejudice by excluding all evidence of Johnson's retirement benefits. Thus, this evidence was both logically and legally relevant, and admissible as it did not constitute evidence of collateral source payments.

The collateral source rule only bars evidence of collateral *compensation* for a plaintiff's injury. *Payton v. Union Pac. R.R.*, 405 S.W.3d 1, 6 (Mo. App. E.D. 2013); *see also Ford v. Gordon*, 990 S.W.2d 83, 85 (Mo. App. W.D. 1999) (discussing the origin and purpose of the collateral source rule in Missouri, stating: "The theory behind the collateral source rule is that a wrongdoer should not enjoy the benefit of reduced liability by showing that the plaintiff has already been compensated for the loss from a collateral source, independent of the wrongdoer."). Evidence that an allegedly injured plaintiff never missed a day of work after his injury, then retired without mentioning any injury or disability, is not barred by the collateral source rule because it is not evidence of payments to compensate the plaintiff for an injury. *See Payton*, 405 S.W.3d at 6.

Therefore, we find the trial court did not abuse its discretion in admitting evidence concerning Johnson's retirement. Point II is denied.

### III.     Point Three – Motions for a Directed Verdict and JNOV were Properly Denied

In his third point on appeal, Johnson argues the trial court erred in denying his motions for a directed verdict and judgment notwithstanding the verdict on the issues of negligence *per se* for Union Pacific's failure to set the handbrake on the UP 9484 while unattended, in violation of 49 C.F.R. 232.103(n) (2007) and Operating Rule 7.6. We disagree.

####     A.     Standard of Review

As a preliminary matter, we note Johnson failed to cite any authority in support of his argument that a *plaintiff* is entitled to a directed verdict or judgment notwithstanding the verdict based on the strength of his own evidence presented at trial, and we have found none. Johnson relies on *Keveney v. Mo. Military Academy*, 304 S.W.3d 98, 104 (Mo. 2010), arguing that the proper standard of review for a trial court's *denial* of a judgment notwithstanding the verdict is "whether the plaintiff made a submissible case." This is incorrect. The standard of review in *Keveney* is applicable when the trial court *grants* judgment notwithstanding the verdict *against a plaintiff*, unlike this case, where the trial court *denied the plaintiff's* motion for judgment notwithstanding the verdict. *Id.*

"The standards of review for a denial of a [defendant's] motion for judgment notwithstanding the verdict and the denial of a [defendant's] motion for directed verdict are essentially the same." *Keveney*, 304 S.W.3d at 104. However, this standard of review differs depending on whether the moving party was the plaintiff or the defendant. "Where a party bears the burden of proof, it is within the jury's prerogative to find against that party, even if that party's evidence is uncontradicted and unimpeached." *River City Dev., Assocs., LLC v. Accurate Disbursing Co., LLC*, 345 S.W.3d 867, 873 (Mo. App. E.D. 2011). Generally, parties bearing the burden of proof are not entitled to a directed verdict. *Cluck v. Union Pac. R.R. Co.*, 367 S.W.3d 25, 28 n.4 (Mo. banc 2012). A plaintiff is entitled to a directed verdict only "in the unusual situation where the defendant has admitted in its pleadings, by counsel, or through the defendant's individual testimony the basic facts of the plaintiff's case." *All Am. Painting, LLC v. Fin. Sols. & Assocs.*, 315 S.W.3d 719, 723 (Mo. banc 2010).

B.      Analysis

19

In order to prove Union Pacific was liable for negligence *per se*, Johnson was required to prove: (1) Union Pacific violated an applicable law or regulation; (2) Union Pacific's violation was the direct and proximate cause of Johnson's injury; and (3) Johnson suffered damages. *See Host*, 460 S.W.3d at 104 (in a claim based on negligence *per se*, "[w]hile the plaintiff is relieved of the burden of establishing the defendant's negligence, the plaintiff retains the burden 'to prove a causal relation between a violation and the injury for which he is suing'") (quoting *Payton v. Union Pac. R.R.*, 405 S.W.3d 1, 5 (Mo. App. E.D. 2013)).

Pursuant to 49 C.F.R. 232.103(n), "[a] train's airbrake shall not be depended upon to hold equipment standing unattended *on a grade* . . . . Unattended equipment shall be secured in accordance with the following requirements: (1) A sufficient number of hand brakes shall be applied to hold the equipment . . ." 49 C.F.R. 232.103(n) (emphasis added). Operating Rule 7.6 required Union Pacific to set a handbrake on equipment whenever unattended.

It is undisputed that the UP 9484 was unattended and did not have a handbrake set on the day of the accident. However, Union Pacific argued there was no violation because the regulation only applies when a train is located *on a grade*. There is no dispute that the UP 9484 was located on "flat ground." Johnson admitted this fact at trial, and his expert testified this regulation applies when equipment is left unattended on a grade, and further agreed with the statement that "it's not an absolute rule that you need a hand brake at all times." Therefore, Johnson failed to establish his negligence *per se* claim based on a violation of 49 C.F.R. 232.103.[7]

---

[7] The version of 49 C.F.R. 232.103(n) in effect in 2007, at the time of Johnson's accident, includes the language "on a grade." However, this phrase was later removed by an amendment in 2015. 80 Fed. Reg. 47350-01 (published August 6, 2015). While Johnson attached to his brief a copy of the later regulation omitting this phrase, our analysis rests on the version of the regulation that was in force at the time of the accident, in 2007. *See Damon v. Grand Trunk W. R.R.*, No. 2:05CV60, 2006 WL 2699736 (N.D. Ind. Sept. 19, 2006) (holding that 49 C.F.R. § 232.103(n) "only applies to unattended equipment left on a grade").

20

Moreover, Union Pacific denied Johnson's allegations concerning causation and damages, arguing Johnson's own negligence was the sole cause of the accident and he suffered no injury as a result of the incident. This case is not one of the unusual circumstances where the defendant admitted all the essential elements of the plaintiff's cause of action. *See All Am. Painting*, 315 S.W.3d at 723. Johnson bore the burden of proof, and it was within the jury's discretion to find against Johnson, which it did by assigning zero percent of the fault to Union Pacific and one-hundred percent to Johnson. *See River City Dev., Assocs., LLC v. Accurate Disbursing Co., LLC*, 345 S.W.3d 867, 872-73 (Mo. App. E.D. 2011) ("Where a party bears the burden of proof, it is within the jury's prerogative to find against that party, even if that party's evidence is uncontradicted and unimpeached."). Therefore, Johnson was not entitled to either a directed verdict or judgment notwithstanding the verdict. *All Am. Painting*, 315 S.W.3d at 723.

The trial court did not err in denying Johnson's motions for a directed verdict and judgment notwithstanding the verdict. Point III is denied.

## IV.    Point Four – The Jury's Verdict Was Not Against the Weight of the Evidence

In his fourth point on appeal, Johnson argues the jury's verdict in favor of Union Pacific, the defendant, was against the weight of the evidence. We disagree, finding this point does not raise a question amenable to appellate review.

In a negligence case, when the jury enters a verdict in favor of the defendant, the appellate court will not overturn the verdict and remand for a new trial on the ground the verdict was against the weight of the evidence. *Ratcliff v. Sprint Mo., Inc.*, 261 S.W.3d 534, 542 (Mo. App. E.D. 2008); *see also River City*, 345 S.W.3d at 872-73 (same rule applied in a breach of contract case). In *River City*, this Court held:

> Plaintiff's contention that the jury's verdict in favor of Defendant is not supported
> by substantial evidence is without merit. Plaintiff bore the burden of proving its

21

breach of contract case. Because Plaintiff bore the burden of proof, "*a verdict in [D]efendant's favor need not be supported by any evidence*." Where a party bears the burden of proof, it is within the jury's prerogative to find against that party, *even if that party's evidence is uncontradicted and unimpeached*. It is well-settled that "the sufficiency of the evidence to support a defendant's verdict is not a question amenable to appellate review."

*Id*. (emphasis added) (internal citations omitted); *Warren v. Thompson*, 862 S.W.2d 513, 514 (Mo. App. W.D. 1993); *see also Scott v. Spears*, 441 S.W.3d 220 (Mo. App. S.D. 2014) (accord); *Giles v. Riverside Transp., Inc.*, 266 S.W.3d 290, 300 (Mo. App. W.D. 2008) (accord); *Desselle v. Complete Home Concepts, Inc.*; 211 S.W.3d 168 (Mo. App. W.D. 2007) (accord).

In *Ratcliff*, this Court squarely rejected Johnson's argument that a verdict in favor of defendant is against the weight of the evidence when the jury is presented with undisputed evidence supporting all the elements of the plaintiff's cause of action. *Ratcliff*, 261 S.W.3d at 542 (affirming judgment in favor of defendant in a negligence case, and rejecting plaintiff's argument that judgement should have been entered in plaintiff's favor because "the evidence substantiated all of the elements of his cause of action").

This rule is based on the principle that determinations concerning the weight of the evidence and credibility of witnesses are within the sole province of the jury, who is entitled to believe or disbelieve any of the evidence presented. *Young v. Kan. C. S. R. Co.*, 374 S.W.2d 150, 153 (Mo. 1964) ("[A] jury may believe all of the testimony of any witness or none of it, or may accept it in part and reject it in part; just as the jury finds it to be true or false when considered in relation to the other testimony and the facts and circumstances in a case."); *see also Erdman v. Condaire, Inc.*, 97 S.W.3d 85, 95 (Mo. App. E.D. 2002) ("The difficulty for appellate courts and specifically here, is that we do not have the benefit of knowing who the jury believed or disbelieved, and we cannot make credibility determinations based on a cold record.").

Therefore, we find Johnson's argument that the jury's verdict in favor of the defendant was against the weight of the evidence does not raise a question amenable to appellate review. Point IV is denied.

## CONCLUSION

We hold that the trial court did not err by granting summary judgment against Johnson on his LIA claims because, as a matter of law, the UP 9484 was not "in use" at the time of the accident; the trial court did not abuse its discretion by admitting evidence concerning Johnson's retirement, the trial court did not err in denying Johnson's motions for a directed verdict and judgment notwithstanding the verdict, and Johnson's argument that the jury's verdict in favor of the defendant was against the weight of the evidence does not raise a question amenable to appellate review. The judgment of the trial court is affirmed.

_____
Angela T. Quigless, P.J.

Robert G. Dowd, Jr., J., and
Lisa Van Amburg, J., Concur

23